SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SARATOGA
-----------------------------------------------------------------------------X
WILLIAM KELLEY,

      Plaintiff,

           Index No. EF20242914

           **<u>AMENDED SUMMONS</u>**

    -against-

MOHAWK FINE PAPERS INC., FEDRIGONI SPECIAL
PAPERS NORTH AMERICA, INC., EDWARD KNOTT,
BRENDA STOKES and AMY WHITNEY
in their professional and individual capacities,

      Defendants.
-----------------------------------------------------------------------------X

**TO THE ABOVE-NAMED DEFENDANTS:**

   **YOU ARE HEREBY SUMMONED**, to answer the Complaint in this action and to

serve a copy of your Answer on the Plaintiff's attorneys within twenty (20) days after the service

of this Summons, exclusive of the day of service (or within thirty [30] days after the service is

complete if this Summons is not personally delivered to you within the State of New York); and

in case of your failure to appear or answer, judgment will be taken against you by default for the

relief demanded in the Complaint.

Dated: New York, New York
   September 24, 2024

          By:

          *Christopher J. Berlingieri*
          Christopher J. Berlingieri, Esq.
          BERLINGIERI LAW, PLLC
          Attorneys for Plaintiff
          244 Fifth Avenue, Suite F276
          New York, New York 10001
          (347) 766-5185
          *cjb@nyctlaw.com*

To:

MOHAWK FINE PAPERS INC.
465 SARATOGA STREET,
COHOES, NY, 12047

1 O'CONNOR DRIVE,
WATERFORD, NY 12188

FEDRIGONI SPECIAL PAPERS
NORTH AMERICA, INC.
c/o C T CORPORATION SYSTEM
28 LIBERTY STREET, NEW YORK, NY, 10005

EDWARD KNOTT,
465 SARATOGA STREET,
COHOES, NY, 12047

JOHN GOMAN
465 SARATOGA STREET,
COHOES, NY, 12047

BRENDA STOKES
465 SARATOGA STREET,
COHOES, NY, 12047

and AMY WHITNEY
465 SARATOGA STREET,
COHOES, NY, 12047

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SARATOGA
-------------------------------------------------------------------------------X
WILLIAM KELLEY,

                             Plaintiff,

                        -against-

MOHAWK FINE PAPERS INC., FEDRIGONI SPECIAL
PAPERS NORTH AMERICA, INC., EDWARD KNOTT,
JOHN GOMAN BRENDA STOKES and AMY WHITNEY,
in their professional and individual capacities,

                           Defendants.
-------------------------------------------------------------------------------X

**Index No. EF20242914**

**<u>AMENDED COMPLAINT</u>**

      WILLIAM KELLEY, ("Plaintiff"), by and through his attorneys, BERLINGIERI LAW, PLLC, as and for his Amended Complaint against MOHAWK FINE PAPERS INC., FEDRIGONI SPECIAL PAPERS NORTH AMERICA, INC., EDWARD KNOTT, JOHN GOMAN, BRENDA STOKES and AMY WHITNEY, in their professional and individual capacities, alleges upon knowledge and belief as himself and her own actions and upon information and belief as to all other matters as follows:

<u>**NATURE OF THE CASE**</u>

      1.    This is a civil action for damages and equitable relief based upon willful violations by the Defendants, Plaintiff complains pursuant to the New York State Human Rights Law (NYSHRL), seeking injunctive relief and monetary damages to redress the injuries he has suffered as a result of, *inter alia*, wrongful termination harassment/hostile work environment on the basis of sex/gender, perceived sexual orientation, disability (physical and mental), and his

association with a disabled individual, denial of reasonable accommodations and retaliation and for claims under the Family Medical Leave Act (FMLA) for interference and retaliation.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this controversy pursuant to New York CPLR § 301 because Defendant transacted business and committed the alleged acts in New York State in Saratoga County.

3.      Venue is proper under New York CPLR § 503. The circumstances giving rise to this action occurred in whole or in part in the county in which this Court sits.

4.      This Court is competent to hear claims under the FMLA 29 U.S. Code § 2615.

## PARTIES

5.      At all relevant times herein, Plaintiff William Kelley was and is a resident of Albany County, New York, and is a "person" and was an "employee" of Defendants under the FMLA, and NYSHRL.

6.      Defendant MOHAWK FINE PAPERS INC., ("Mohawk") is a corporation organized under the laws of the State of New York, with a principal place of business in New York located at 465 Saratoga Street, Cohoes, NY, 12047 and operates a facility located at 1 O'Connor Drive, Waterford, NY 12188, Saratoga County.

7.      Defendant FEDRIGONI SPECIAL PAPERS NORTH AMERICA, INC. ("Fedrigoni") is a corporation organized under the laws of the State of Delaware, with a principal place of business in New York located at 465 Saratoga Street, Cohoes, NY, 12047.

8.      Defendant Mohawk is a subsidiary of Defendant Fedrigoni that share Human Resources, company policies and act and operate as Co-Employers or Joint Employers under NYSHRL, FMLA.

2

Case 1:24-cv-01264-AMN-DJS    Document 2    Filed 10/15/24    Page 5 of 27

9.      At all relevant times herein, Defendant EDWARD KNOTT ("Mr. Knott"), was and is a resident of the State of New York and was and is an officer [vice president] / manager of Mohawk/Fedrigoni at all relevant times complained of herein.

10.     At all relevant times herein, Defendant JOHN GOMAN ("Mr. Goman"), was and is a resident of the State of New York and was a manager of Mohawk/Fedrigoni at all relevant times complained of herein.

11.     At all relevant times herein, Defendant BRENDA STOKES ("Ms. Stokes") was and is a resident of the Commonwealth of Massachusetts and was and is a Human Resources Director of Mohawk/Fedrigoni at all relevant times complained of herein.

12.     At all relevant times herein, Defendant AMY WHITNEY ("Ms. Whitney") was and is a resident of the State of New York and was and is a Human Resources employee of Mohawk/Fedrigoni at all relevant times complained of herein.

13.     The above referenced Defendants are collectively referred herein after to as ("Defendants").

14.     Defendants are employers under NYSHRL and FMLA.

## FACTUAL BACKGROUND

15.     Plaintiff suffers from disabilities (physical (spine/ back) and mental (anxiety /bi-polar)) and was associated with an individual with disabilities.

16.     Defendants are fine paper manufacturers operating out of the Mohawk facility located at Waterford, New York, in Saratoga County hereinafter referred to as the ("workplace").

17.     Defendants also maintained a facility in Cohoes, New York.

18.     Plaintiff commenced his employment with Mohawk on or about November 14, 2014 until his wrongful termination on or about February 23, 2024.

3

Case 1:24-cv-01264-AMN-DJS    Document 2    Filed 10/15/24    Page 6 of 27

19.    During his employment Plaintiff disclosed his disabilities to Defendants.

20.    Plaintiff most recently held the position of an assistant supervisor/sample associate/for Defendants.

21.    Defendants' Mr. Goman manager of Defendant's Central Storage department harassed Plaintiff frequently.

22.    For example, Mr. Goman bullied Plaintiff and demanded that Plaintiff perform work for him, even though Plaintiff was not in his department.

23.    Further, Mr. Goman colluded with Mr. Knott to treat Plaintiff differently for example, verbal abuse, bullying, hanging up the phone, giving vague directions and threatening if asked a question/ didn't understand).

24.    Mr. Goman and Mr. Knott (primarily based out of the Cohoes, NY facility) constantly disregard safety concerns and complaints at the Waterford facility.

25.    For example, when Defendants' Safety Coordinator, Sophia Ferraro attempted to implement changes to the Plaintiff's department due to outstanding OSHA safety concerns, Knott and Goman shot down any changes from Ms. Ferraro that would have ensured Plaintiff a safe working environment.

26.    For example when Goman had conversations with Plaintiff in or around February – March 2022 he asked extremely vague questions and when Plaintiff could not answer his question properly (for lack of information given), or made a mistake Goman repeatedly asked "are you retarded?" or asked "are you on crack?" to embarrass and haze Plaintiff in front of his coworkers.

27.    Plaintiff had an undiagnosed back condition in early 2022 due to a workplace injury. Plaintiff continued to seek medical treatment due to the excruciating pain.

4

28.     Plaintiff began to experience severe back issues after Mr. Goman forced Plaintiff to perform work for him that was physically strenuous and referred to Plaintiff as "young and healthy".

29.     At Goman's direction Plaintiff suffered a workplace injury to his back in March 2022, when Goman forced Plaintiff to work alone and go underneath a forklift and slide paper product above his head into storage bins off of the elevated forklift.

30.     Plaintiff was injured because Goman with the approval of the Employer Defendants, left his department understaffed, as many workers left Employer Defendants' employ due to Goman's poor attitude and frequent workplace misconduct.

31.     Plaintiff informed his boss Edward Ormsby ("Mr. Ormsby") about his need for medical for his injury and to complain against Mr. Goman, Mr. Ormsby informed Plaintiff that if Plaintiff was in need of surgery or serious medical attention that he may be let go by Defendants if Plaintiff needed to take leave and dissuaded him from filing a workers compensation claim or filing a HR complaint against Goman.

32.     Mr. Ormsby dissuaded Plaintiff from following up with a workers compensation claim or HR complaint against Goman due to Defendants' known propensity to retaliate and that it would make his life at work even more difficult.

33.     Mr. Ormsby also informed Plaintiff that even if Plaintiff complained about Goman to HR that "nothing would be done" by Defendants.

34.     Mr. Ormsby informed Plaintiff to keep his mouth shut to "prevent the target on your [Plaintiff's] back from getting bigger.

35.     Further Mr. Ormsby was aware of Plaintiff's mental health disabilities and he and Goman openly spoke with Plaintiff about his diagnosis.

5

36.     Given Plaintiff's apparent pain and discomfort for his injury, Mr. Ormsby was the only person who understood and tried to help Plaintiff in some regards by permitting Plaintiff to use a specialized chair, and assisted Plaintiff with certain physically demanding activities when Plaintiff was in severe pain).  When the pain would get severe Plaintiff would sit on a rolling rack cart to ease his pain. The nerve pain would run from his lower lumbar to his hip joint-thigh in his right leg and would cause Plaintiff to become immobile.

37.     In or April 8, 2022 Plaintiff sought medical attention for a back injury (lumbar/spine injury).

38.     On the contrary, Goman and Knott were not very helpful or understanding with Plaintiff's disabilities.

39.     Plaintiff was forced to perform unsafe work without proper staffing (typically five employees) resulting in injury. Plaintiff was also required to lift heavy hydraulic pistons twice per year including in 2022.

40.     Goman and Knott berated Plaintiff for failing to complete physical tasks in unreasonable timeframes and refused Plaintiff's requests to get help from the other departments because Plaintiff was expected to do the labor alone which was extremely dangerous and physically demanding.

41.     Defendants also expected Plaintiff to, at times, run his five employee department by himself and further, Defendants discouraged to take time off for any reason.

42.     When Plaintiff utilized his paid time off to go to the doctors or take off for any reason, Mr. Knott became frustrated and irate with Plaintiff because Mr. Knott had to find coverage for Plaintiff which required Mr. Ormsby to dedicate his time and not help him in his adjacent department during Plaintiff's absence.

6

43.    Mr. Knott did not treat other employees in the same way with respect to time off.

44.    After Plaintiff's doctor's visit, Plaintiff discussed his injury with Mr. Knott.

45.    Mr. Knott humiliated Plaintiff and called him a "pussy" and asserted dominance over Plaintiff.

46.    Further Goman/Knott harassed Plaintiff for performing computer work while sitting and called Plaintiff a "pussy" for having the pain/ sitting down.

47.    Mr. Ormsby encouraged Plaintiff to refrain from sitting down when Knott/Goman were around because Ormsby knew that they would retaliate against Knott/Goman or make an insulting comment.

48.    Knott/Goman harassed Plaintiff on the basis of his perceived sexual orientation and perceived him to be homosexual male when in fact Plaintiff is a straight male.

49.    Further Knott/ Goman barraged Plaintiff with homophobic remarks about Plaintiff's pain, stating that his pain was due to engaging in gay sex acts including but not limited to oral/anal sex.

50.    Mr. Knott demeaned Plaintiff and referred to him as "Sparky" and referred to another employee as "Billy" and refused to call Plaintiff by his name.

51.    Plaintiff during his employment informed Defendants that he had a mental health condition (anxiety/bi-polar) and that he sought treatment for his mental health.

52.    Defendants used that information against Plaintiff, and treated him worse due to his mental health.

53.    For example, in or around March 2023, Plaintiff suffered a negative reaction to a mood stabilizer medication that his mental health care provider placed him on, and became sick, nauseous, pale and distressed.

7

54.     Steve Justus, a coworker, from another department, witnessed Plaintiff in distress and was concerned that Plaintiff was in harm. Due to his negative reaction to his mental health medication Plaintiff was not able to clearly communicate verbally and was slow to process things mentally. Mr. Justus realized Plaintiff was suffering a mental health medical episode and informed Mr. Knott and Mr. Goman.

55.     Mr. Knott and Mr. Goman invaded Plaintiff's personal spaced and cornered him at his computer terminal and began to question Plaintiff's condition.

56.     Plaintiff was anxious and felt symptoms of his mental disabilities.

57.     Mr. Knott presented Plaintiff with a pamphlet for the company's employee assistance program (EAP), which included a 1-800 number to call for assistance and employee wellness program which included services such as mental health, debt management or family counseling.

58.     After he received the Plaintiff to inquire about mental health services they offered and also inquired about debt help services.

59.     The EAP asked Plaintiff if he wanted to go voluntarily go to a mental health facility in Saratoga County, New York for individuals with severe mental health issues that they could arrange.

60.     Plaintiff declined as he simply needed to change his medication and discuss with his provider, not be committed to a mental health facility as per EAP's suggestion.

61.     After his medical episode, Plaintiff was asked to visit Mr. Goman at his office in Cohoes, New York if he needed to talk, further, Goman and Knott then provided their phone numbers to Plaintiff in the event he needed to talk.

8

62.    In 2023, Plaintiff was receiving mental health therapy regularly with his own provider and declined the EAP service. Plaintiff was in a connective care program where his doctor and therapist were in contact to better help him and Plaintiff felt that the EAP service offered little benefit at the time because he did not need a second therapist.

63.    Mr. Knott made frequent insults about Plaintiff's back injury and his weight and Plaintiff's mental health conditions and perceived sexual orientation.

64.    Plaintiff was forced to lift the heavy piston despite his back injury, Defendants managers insisted that Plaintiff lift the piston because he was the "young man" and disregarded his back limitations.

65.    Plaintiff after his back injury Mr. Goman provided Plaintiff a back-brace and instructed Plaintiff to heavy better lifting practices and permitted him to use a specialized chair, yet still required him to do dangerous work and made comments about his back injury and weight.

66.    Mr. Goman informed Plaintiff that he was "too young" to get injured or have these sort of health problems and to "stop being a pussy" about his injury.

67.    Mr. Goman also informed Plaintiff not to file out any paperwork for any type of claim because Plaintiff was still able to work in some capacity.

68.    After Mr. Goman provided Plaintiff a back-brace, Mr. Goman also mentioned to Plaintiff that his injury was too vague and was not specified and therefore Defendants were not responsible because Plaintiff could not point to one specific event for the cause of the workplace injury.

69.    Plaintiff informed Mr. Goman that he was seeking medical treatment and diagnosis for his injury and that his diagnosis is a pending medical diagnosis, and that his

9

Case 1:24-cv-01264-AMN-DJS     Document 2     Filed 10/15/24     Page 12 of 27

condition can be caused by repeated motion, high weight spinal compressions, or intense physical labor over time and that he would have more information on this soon.

70.     Plaintiff continued to work with pain and sought medical treatment for his injury.

71.     At present Plaintiff is seeking medical care and pending a more precise diagnosis and further scans, including the need for tests, MRIs and physical therapy for his spinal/lumbar injury and conditions.

72.     As of the filing of this Complaint, Plaintiff in or around September 2024, after several doctors' visits, x-rays and tests, Plaintiff has been diagnosed with back/spine issues of: "Spondylolisthesis: 12 mm anterior spondylolisthesis of L4 on L5", "Spondylolysis: Bilateral L4-5 spondylolysis" and "Disc space narrowing: Disc space narrowing of L4-5."

73.     Plaintiff was subjected to discrimination on the basis of his disability and association with an individual (his father) and his need to take leave to care for his father.

74.     In or about October/ November of 2022 Plaintiff made an inquiry with Mohawk Human Resources (Ms. Stokes) regarding information on NYPFL [New York Paid Family Leave][1] and FMLA as Plaintiff's father was recently diagnosed with stage 4 kidney cancer.

75.     Plaintiff communicated with Ms. Stokes and wanted to know what leave options he had available.

76.     As time progressed Plaintiff's father health stabilized with continued chemotherapy, not prompting Plaintiff's need for leave at the time and he thanked Ms. Stokes for the information regarding his rights under FMLA and NYPFL and declined to take leave.

---

[1] 12 N.Y.C.R.R. §380-1.0-10.2 (Employees may use 12 weeks of paid family leave at 67% of their regular pay rate to bond with a new child, to care for a family member with a serious health condition, or to assist with family obligations when a family member is called to active military service

77.     Plaintiff essentially informed Ms. Stokes that he wanted to know what he could do if he needed leave and ask what leave he could take under the paid leave under NYPFL and unpaid leave FMLA.

78.     Under NYPFL qualified employees may be eligible to take up to 12 weeks of Paid Family Leave at 67 percent of their pay, up to a cap.[2]

79.     Approximately one year later in or around late November/ early December 2023 Plaintiff's father's condition worsened.

80.     Plaintiff asked Ms. Whitney (HR/payroll) again about taking NYPFL or FMLA because of his father's decline and need for care at home by Plaintiff.

81.     Plaintiff had reached out to Ms. Stokes but did not hear back from her.

82.     Plaintiff's father lost ability to walk sometime in late November and had spent many days/weeks in the hospital and was bedridden for several weeks.

83.     In or around late November/early December 2023Plaintiff decided that he needed to take NYPFL/FMLA for his return in late December.

84.     Plaintiff began filling out paperwork and called Symetra the Defendants' NYPFL insurance carrier for Plaintiff's NYPFL claim. Plaintiff's father was not expected home until just before Christmas.

85.     Symetra told Plaintiff that they were ending their contract with Mohawk January 1, 2024, and that they would not be able to cover Plaintiff if it took over 2 weeks to complete. They informed Plaintiff to call Ms. Whitney in Human Resources again and request information for the new insurance carrier.

---

[2] https://paidfamilyleave.ny.gov/paid-family-leave-family-care

11

86.     Ms. Whitney very condescendingly answered Plaintiff that the new carrier was not ready yet and that Plaintiff shouldn't wait for it, Plaintiff should keep continuing with Symetra. Plaintiff filed the claim over the phone, and began filling out paperwork with Symetra.

87.     During the holidays 2023-2024, Plaintiff's father's doctor was on vacation and unable to respond, Plaintiff decided that it would be best to email her back and try again in (2 weeks) at the beginning of the New Year 2024 with Mohawk's new carrier New York Life and process his claim for PFMLA with the new carrier.

88.     Over the next two weeks at the end of January 2024, Plaintiff took his two week vacation at the beginning of the year. This is something Plaintiff had done annually since Plaintiff started with Mohawk.

89.     Plaintiff returned to work on January 16, 2023.

90.     Plaintiff, feeling refreshed after his vacation and having his father a stabilized condition, around mid-January Plaintiff emailed Mohawk HR again about the processing his claim through the new carrier.

91.     Ms. Stokes responded to Plaintiff's request and began to process on Plaintiff's PFMLA paperwork.

92.     After Plaintiff's return to work Mr. Knott targeted for you know reason after Mr. Knott selected the wrong type of paper central department and attacked Plaintiff verbally without any basis.

93.     Around the same time (mid-January 2024), Plaintiff's caregiving duties increased with his father as medical equipment, home cleaning and a hospital bed set up was done for Plaintiff's father's return from the rehabilitation center on January 22, 2024.

94. During this time Plaintiff utilized few days of PTO to assist his father's care needs.

95. In the meantime, Plaintiff submitted his FMLA paperwork near the end of January and began working on his NYPFL.

96. Plaintiff's intermittent FMLA leave was approved on February 6, 2024; further Mohawk mailed a letter approving FMLA signed from Ms. Stokes to Plaintiff's home address.

97. As to Plaintiff's NYPFL claim (which provides for paid leave [as opposed to FMLA's unpaid leave]) Plaintiff followed the steps Ms. Stokes provided which were clear and simple. Plaintiff submitted the application online for the NYPFL which was the last step in the process.

98. As the month continued it seemed to stall out. Plaintiff called New York Life at one point and they told Plaintiff they were still waiting on Plaintiff's employer.

99. Plaintiff had February 12, 2024 off as a pre-established personal day (Plaintiff and his manager had an agreement that if one of their NFL football teams made it to the Super Bowl then they could have the following Monday off), Plaintiff is a Kansas City Chiefs fan and his team won the Super Bowl, so he got off.

100. Around the time of the February 15-17, 2024, unbeknownst to Plaintiff his NYPFL paperwork arrived in the mail at Plaintiff's residence, due to his care taking duties and second job Plaintiff had not physically recovered the mail containing his NYPFL approval.

101. Plaintiff's father was extremely ill over the weekend of February 17- 18, 2024 prompting Plaintiff to dedicate time to care.

102. Plaintiff advised Plaintiff's boss Ed Ormsby via text message that Plaintiff needed to tend to Plaintiff's father. Ed Ormsby replied with no concerns and seemed very understanding.

13

103.    On Monday February 19, 2024. Plaintiff received a strange text from Plaintiff's boss Ed Ormsby inquiring about Plaintiff's FMLA/PFL leave. Ed Ormsby asked if Plaintiff's leave was approved, and Plaintiff replied that Plaintiff to his knowledge he had unpaid intermittent FMLA approved but was unsure about the status of his NYPFL leave as Plaintiff had not heard back from New York Life.

104.    Ed Ormsby then called Plaintiff on the telephone to discuss the status of his NYPFL leave after Plaintiff had texted him pictures of his approved FMLA paperwork.

105.    Shortly after Plaintiff finished his call with Ed Ormsby, he received a call from Ms. Whitney (in Defendants' payroll/HR department) falsely accusing Plaintiff of "committing fraud" and getting "paid twice".

106.    Ms. Whitney's suggested in a harsh tone that Plaintiff was purposefully collecting PTO and NYPFL knowingly to defraud Defendants. Plaintiff denied this and stated, "That's impossible I haven't received paperwork from New York Life." Ms. Whitney replied to Plaintiff that he should have it or will get it soon. Plaintiff needed to fill it out immediately.

107.    At that moment, Plaintiff remembered Plaintiff's mother (who is also seriously ill) had gotten the mail Sunday afternoon (February 18. 2024), and Plaintiff remembered that he saw the paperwork from New York Life.

108.    Plaintiff quickly apologized to her and confirmed that Plaintiff was not committing fraud like she was accusing rather that Plaintiff was under the impression that Plaintiff needed to use vacation time before starting paid leave. Ms. Whitney informed Plaintiff that she would remove Plaintiff's vacation time for February 19, 20, 21, 2024.

109.    At that point Plaintiff was still unsure whether he would be approved for NYPFL. Ms. Whitney informed Plaintiff that the Defendants would not provide Plaintiff any

Case 1:24-cv-01264-AMN-DJS    Document 2    Filed 10/15/24    Page 17 of 27

PTO for this period above (19-21 Feb.) and that upon his approval from New York life Plaintiff could retroactively recover Plaintiff's paid leave for those days.

110.    Plaintiff was confused by his denial of PTO while pending approval on NYPFL as Defendants permitted Plaintiff and other employees permission to use their paid time off / vacation time as one in the same, when needed in cases like this, as it is Defendant policy to permit employees use PTO without notice.

111.    Contrary to Ms. Whitney's false assertion Plaintiff did not commit fraud Plaintiff, rather Plaintiff followed the rules and procedures the same way Plaintiff had followed for nearly 10 years when emergency PTO was needed.

112.    Plaintiff was embarrassed and scared that Plaintiff possibly had broken a rule Plaintiff wasn't aware of. Plaintiff hurried to finish the paperwork and ran to his father's doctor on Plaintiff's lunch break for his signature on Thursday February 22, 2024. Plaintiff's father's doctor was on vacation until the next day Friday February 23, 2024, but Plaintiff at least had the necessary form completed [pending Plaintiff's doctor's signature] and Plaintiff began to fax it to New York Life that afternoon [Feb. 22, 2024].

113.    Making matters even worse, Plaintiff had to beg HR for the company's New York Life policy number. HR informed Plaintiff that they were too busy and would "put in on their list".

114.    Plaintiff has yet to receive it the New York Life policy number, Plaintiff communicated with  New York Life via a direct messaging function on their website using a web browser in order to obtain the correct policy number to submit the remaining portion of his application.

15

115.    Defendants purposefully failed to supply Plaintiff its company policy number to file/complete the claim with New York Life. Plaintiff had to obtain the company policy number from New York Life directly. Defendants were aware that Plaintiff's NTYPFL claim could not be filed unless Plaintiff had their policy number, yet they denied Plaintiff access to it.

116.    When Plaintiff first returned to work Thursday February 22, 2024, Plaintiff had a weird feeling. Multiple coworkers approached Plaintiff and accused Plaintiff of "double dipping" somehow the rumor that Plaintiff was committing NYPFL insurance fraud spread to the Defendants' facility.

117.    Even more disconcerting, was that Plaintiff's leave request and status were being spread throughout the facility painting Plaintiff in a fraudulent light, Plaintiff brushed this off believing it was a misunderstanding [as Plaintiff was not even technically enrolled in NYPFL his application was pending and at the time was not collecting NYPFL or any other benefit and was on unpaid leave from 19-21 Feb. because HR denied his PTO usage] and continued Plaintiff's work.

118.    In the afternoon of February 22, 2024, Mohawk's computer system went down and shipping stopped. Strangely, during this downtime Plaintiff's co-worker Harry Thompkins began asking Plaintiff about skills and job functions that only Plaintiff, and Plaintiff's boss Ed Ormsby perform.

119.     Plaintiff politely declined Thompkins's questions because Plaintiff was busy working.

120.    Further Thompkins also began training another co-worker Gary Cuomo.

121.    Gary Cuomo was recovering from an injury/ surgery procedure and was being trained in Plaintiff's department. This to Plaintiff was odd, so Plaintiff asked him why he was

16

Case 1:24-cv-01264-AMN-DJS    Document 2    Filed 10/15/24    Page 19 of 27

training in Plaintiff's department, Thompkins responded that Gary Cuomo was learning Plaintiff's job in case Plaintiff wasn't there, or on leave Gary Cuomo would replace him in the same position.

122.    Plaintiff's job is not a "light duty job" we have to be able to lift 50 or more pounds up ladders. At the time Plaintiff thought little of this, because Gary Cuomo worked in the department adjacent to Plaintiff's department and Plaintiff is cross trained in some, or all of the other department's duties as well and Plaintiff could see how Gary Cuomo would want to be cross trained.

123.    The remainder of the workday on February 22, 2024, ended normally and Plaintiff went home and tended to Plaintiff's father.

124.    On Friday, February 23, 2024, Plaintiff went to work in to put his best foot forward for his job, shipping resumed in his department, Plaintiff solved an issue with marketing and took care of Plaintiff's morning tasks as normal.

125.    However round 11:40 Plaintiff received a phone call from Mr. Knott (Defendant's senior vice president of purchasing), Mr. Knott did not identify himself on the call, and Plaintiff asked if he was calling for Ed Ormsby Plaintiff's boss, however Mr. Knott said "no, stay there don't go to lunch I'm coming over now" before Plaintiff could answer he hung up on Plaintiff.

126.    Mr. Knott had a terse and juvenile/unprofessional attitude towards Plaintiff.

127.    Mr. Knott made comments to Plaintiff and about Plaintiff due to his disability and need for leave to take care of his father who is disabled.

128.    Plaintiff assumed Mr. Knott wanted to speak with him and Ed Ormsby about something in the department, but Ed Ormsby went out to lunch, Plaintiff then went to assist

17

another coworker (Harry) on difficult task, soon after Plaintiff finished Plaintiff began to walk back to Plaintiff's computer terminal in the back of the warehouse and Plaintiff saw Ed walking to Plaintiff.

129.    After Mr. Knott called and hung up on Plaintiff, the Defendants' secretary Haileigh Justus "Ms. Justus") called Plaintiff to inform him that Mr. Knott seemed off and agitated and that he had asked her to call Plaintiff to instruct him not to leave the building.

130.    Plaintiff sensed a feeling of dread when Defendant Ed Knot approached, in fact, Plaintiff even mentioned to Harry that something fell off.

131.    Plaintiff assured himself that Mr. Knott most likely needed Plaintiff to do a special assignment or had a request for him. This is very common with him, in Plaintiff's near ten (10) years with Mohawk, Mr. Knott and Plaintiff earned a "trust" in each other that he only shares between Plaintiff and Ed Ormsby. In the past Mr. Knott would ask for things ranging from shipping out something of high importance, or brining paper for his copy machine.

132.    This was not the case here, when Mr. Knott announced himself to Plaintiff, where he in a stern aggressive voice cleared the room and said to Harry and Gary Cuomo "go to lunch".

133.    Harry sensed the tension in the room and tried to lighten the mood by telling a joke to Mr. Knott. However, Mr. Knott cut him off immediately and said " I think you two (Harry and Gary Cuomo) should go to lunch I need to talk to Bill [Plaintiff] in private " in the same aggressive tone.

134.    Immediately Plaintiff was concerned about the nature of Mr. Knott's demeanor,

135.    As soon as Plaintiff's coworkers left confused and bewildered at Mr. Knott's order to "go to lunch" once, Mr. Knott had Plaintiff in private he said to Plaintiff "as you know

18

we're experiencing tough times and we had to make cutbacks, samples [Plaintiff's department] is not what it used to be so we decided to eliminate your position, you are terminated immediately."

136.     Extremely confused Plaintiff asked, "Why me?", and Mr. Knott said, "we eliminated your position".

137.     Plaintiff further inquired with Mr. Knott "why would you fire me? I'm the only person who knows how to run the department. Harry has no idea how to do my skill set or even use the computer".

138.     Mr. Knott coldly responded "it was a business decision" to terminate Plaintiff.

139.     Plaintiff replied, "so you decided to fire, the highest qualified, longest tenured person at this position" and that's when Mr. Knott turned flush red faced and looked down his shoes with no eye-contact with Plaintiff stating "it was a business decision, we sat down at a meeting and said you had to go" at this point Plaintiff was extremely frustrated and Plaintiff let it show in Plaintiff's voice. Plaintiff replied, "This makes absolutely no sense, I could see if you eliminated the entire department but why did you single me out?" He replied, "We didn't single you out" and Plaintiff said, "You absolutely did, then why didn't you fire Harry then, what was your reason for picking me?"

140.     With no good answer, Mr. Knott said "it was a business decision you need to speak to Ms. Stokes." Stokes in HR" a few more times Plaintiff asked similar questions to no real answer given

141.     Plaintiff found this odd because at his termination meeting with Mr. Knott, HR [Stokes, Whitney, et al.] was not present, which is contrary to Mohawk/Defendant's longstanding HR policy to have HR and a witness present at an in person termination meeting at the workplace.

19

142.    Plaintiff sensed that something seemed out of place, due to his almost decade experience at Mohawk because positions were not just eliminated like this and terminations were not carried out in such a subversive manner. Mr. Knott simply told Plaintiff was terminated effective immediate and failed to provide any paperwork as normal.

143.    Defendants did not treat Plaintiff's similarly situated coworkers in the same way.

144.    In fact, Plaintiff's position was not eliminated.

145.    After Mr. Knott terminated Plaintiff's employment, Ms. Justus texted Plaintiff to inform him that his supposedly "eliminated" position was now going to be filled by Mr. Cuomo.

146.    Ms. Justus's communications on behalf of Defendants to Plaintiff contradict Mr. Knott's statements to Plaintiff at his termination that Defendants eliminated Plaintiff's position and would be using a "two man crew" with Ed Ormsby and Harry Thompkins.

147.    Plaintiff never heard back from New York Life on his NYPFL leave application or status.

148.    Plaintiff reached out to HR after three attempts and spoke with Ms. Stokes who was evasive and informed Plaintiff that is was a business decision to terminate him with no explanation.

149.    Plaintiff at the time of his termination had approved intermittent FMLA.

150.    On March 27, 2024, Plaintiff's father passed away after a two-year long battle with cancer.

151.    As a result of Defendants' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

152.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer loss of income, loss of salary, bonuses, benefits, and other

20

compensation which such employment entails, and emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

153.    Plaintiff has further experienced severe emotional and physical distress.

154.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants, jointly and severally.

155.    The above are just some examples of some of the unlawful discrimination and retaliation to which Defendant subjected Plaintiff.

156.    Defendants' actions constituted a continuing violation of the applicable laws.

## AS A FIRST CLAIM FOR RELIEF AS TO DEFENDANTS
### *Discrimination under NYSHRL as to all Defendants*

157.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

158.    Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

159.    Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of sex/gender, perceived sexual orientation, disability (physical and mental) and his association with an individual with a disability.

160.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

21

## AS A SECOND CLAIM FOR RELIEF AS TO DEFENDANTS
### *Retaliation under NYSHRL as to all Defendants*

161.    Plaintiff, repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

162.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

163.    Defendants engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff.

## AS A THIRD CLAIM FOR RELIEF AS TO DEFENDANTS
### *Aiding and Abetting under NYSHRL as to all Defendants*

164.    Plaintiff, repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

165.    As New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

166.    Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

22

### AS A FOURTH CLAIM FOR RELIEF AS TO DEFENDANTS
#### *Interference under FMLA against Defendants Mohawk/Fedrigoni*

167.     Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

168.     The FMLA in pertinent part states: "29 U.S. Code § 2615 - Prohibited acts" "(a) Interference with rights (1) Exercise of rights It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

169.     Defendants Mohawk/Fedrigoni unlawfully interfered, restrained and denied Plaintiff's right to exercise and attempt to exercise his rights under the above section, and discriminated and retaliated against Plaintiff by terminating Plaintiff from his employment for opposing Defendant's unlawful employment practice and attempting to exercise his rights.

170.     Plaintiff suffered damages as a result.

171.     Defendants' actions to interfere with Plaintiff's rights under the FMLA were willful.

### AS A FIFTH CLAIM FOR RELIEF AS TO DEFENDANTS
#### *Retaliation under FMLA against Defendants Mohawk/Fedrigoni*

172.     Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

173.     FMLA in pertinent part states: " "29 U.S. Code § 2615 (2) Discrimination It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter … (b) … It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual— (1) has filed any charge, or has instituted or caused to be instituted

any proceeding, under or related to this subchapter;(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter."

174.    Plaintiff engaged in protected activity under the FMLA.

175.    Defendants Mohawk/Fedrigoni violated the FMLA by terminating Plaintiff for taking FMLA leave in retaliation.

176.    Plaintiff suffered damages as a result.

177.    Defendants' actions to interfere with Plaintiff's rights under the FMLA were willful.

24

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned New York State and federal laws;

B.      Awarding Plaintiff all back pay sustained as a result of the Defendants' conduct;

C.      Awarding Plaintiff compensatory damages;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiffs costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

F.      Pre-judgment and post-judgment interest, as provided by law; and

G.      Granting Plaintiffs further relief as this Court finds necessary and proper.

Dated: New York, New York
       September 24, 2024

By:
*Christopher J. Berlingieri*
Christopher J. Berlingieri, Esq.
BERLINGIERI LAW, PLLC
*Attorneys for Plaintiff*
244 Fifth Avenue, Suite F276
New York, New York 10001
Tel.: (347) 766-5185
Fax: (914) 730-1044
Email: cjb@nyctlaw.com

25